IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:21-cr-25 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER GRANTING DEFENDANT** |
| | : | **DANIEL BRYANT'S MOTION TO** |
| DANIEL BRYANT, | : | **SUPPRESS EVIDENCE (DOC. 20)** |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Daniel Bryant's Motion to Suppress Evidence (Doc. 20), which the Government opposes (Doc. 21). The Court held a hearing on Defendant's Motion to Suppress on March 10, 2022. (Docs. 34, 35.) Following the hearing, the parties submitted Post-Hearing Briefs. (Docs. 37, 38.) For the reasons that follow, Defendant's Motion will be **GRANTED**.

**I.     BACKGROUND**[1]

**A.  Surveillance at Sunset Avenue**

This case involves the traffic stop of Defendant Daniel Bryant's vehicle on November 6, 2020, when Cincinnati Police Department ("CPD") Lieutenant David Schofield was patrolling the East Price Hill neighborhood in Cincinnati, Ohio. (Transcript, Doc. 35 at PageID 169, 172.) Lieutenant Schofield has been a police officer with CPD since 2006 and has held positions of increasing responsibility including that of patrol officer, detective, patrol supervisor, and

---

[1] The facts of this case were presented during the March 10, 2022 Suppression Hearing through the testimony of Lieutenant David Schofield, Officer Jerome Herring, and Officer Katelyn Hoffbauer. (*See* Doc. 35.) The Court also admitted six exhibits: a map depicting the location of Bryant's arrest (Gov. Exhibit 1); a police car dash camera video (Gov. Exhibit 2); Officer Herring's body-worn camera portraying the incident (Gov. Exhibit 3); Mobile Dispatch Computer ("MDC") report (Gov. Exhibit 4); CAD report (Gov. Exhibit 5); and Officer Hoffbauer's body-worn camera portraying the incident (Gov. Exhibit 6).

1

lieutenant. (*Id*. at PageID 170–71.) Lieutenant Schofield was working as a member of the Gun Crime Task Force Unit in November 2020. (*Id*. at PageID 171.)

The Goal of the 2020 Gun Crime Task Force Unit was to reduce shootings city-wide by focusing efforts on neighborhoods most affected by gun violence. (*Id*. at PageID 173.) East Price Hill is one such neighborhood that was selected for patrol. (*Id*.) Based on Lieutenant Schofield's fifteen years of experience, many shootings are drug related, and many drug crimes and activities occur in parking lots. (*Id*. at PageID 170, 171, 173.) Parking lots can be places where criminal behavior is less likely to be noticed because it is easier for a criminal to "blend in." (*Id*. at PageID 174.)

On November 6, 2020 at around 5:10 p.m., Lieutenant Schofield was working in a plain-clothes capacity in an unmarked vehicle when he pulled into the parking lot of the Clearpointe Woods Apartment Complex at 1836 Sunset Avenue in East Price Hill. (*Id*. at PageID 175–76.) Lieutenant Schofield noticed something of interest: a dark, newer model vehicle with heavy window tint that appeared to be "just waiting" in the area. (*Id*. at PageID 175–76.) This vehicle, a Nissan Altima, was later identified as Bryant's car. (*Id*. at PageID 175–76, 192.) The vehicle attracted Lieutenant Schofield's attention because drug crimes often occur with one vehicle arriving and waiting until another vehicle or person meets with the occupants. (*Id*. at PageID 176.) Lieutenant Schofield watched the vehicle for less than five minutes until it proceeded to leave and continued down the driveway towards Sunset Avenue. (*Id*. at PageID 178.) Lieutenant Schofield radioed nearby uniformed CPD Officers Jerome Herring and Katelyn Hoffbauer to convey what he had observed and ask them to query the license plate of Bryant's car. (*Id*. at PageID 178, 273, 279.)

At 5:14 p.m., Officer Hoffbauer, who was patrolling in a marked police vehicle with her partner, Officer Herring, queried Bryant's plate using a Mobile Dispatch Computer ("MDC"). (*Id*. at PageID 273–74; Gov. Ex. 3 at 2:23 (showing Bryant's photo).) The query conveyed that the vehicle was registered to Daniel Bryant, who had violent history indicators, and that there was a traffic capias at the time, which was an active warrant for Bryant's arrest. (Doc. 35 at PageID 274–75.) Officer Hoffbauer informed Officer Herring that there was an arrest warrant linked to the car and radioed the same information back to Lieutenant Schofield. (*Id*. at 180, 209, 275.)

Meanwhile, back at the apartment complex, Bryant's vehicle stopped partway down the driveway for less than a minute "for no apparent reason[,]" which made Lieutenant Schofield "uncomfortable" and "concerned." (*Id*. at PageID 179.) Lieutenant Schofield was concerned that perhaps Bryant noticed *his* new model vehicle and heavy window tint and perceived him to be a police officer. (*Id*.) He also was concerned that he could be perceived as an adversary if the person was involved in drug-trafficking or gang-related type behavior. (*Id*.) He was also worried the driver was concerned that he was following him. (*Id*. at PageID 183.)

Lieutenant Schofield started to proceed as if he was going to go around Bryant's vehicle, but as he started to make the motion to go around, Bryant conducted a U-turn and returned up to the apartment complex. (*Id*.) Lieutenant Schofield found this suspicious because he did not know the intentions of the driver. (*Id*.) He described the U-turn to Officers Herring and Hoffbauer and asked them to move forward to investigate the warrant attached to Bryant's plate. (*Id*. at PageID 184.) The uniformed cars proceeded past Lieutenant Schofield's vehicle to get in position behind Bryant's vehicle and conduct a stop of Bryant's vehicle. (*Id*.)

3

The dash camera of Officers Herring and Hoffbauer's police vehicle shows that as they pulled into the apartment complex parking lot at about 5:18 p.m., Bryant's vehicle was stopped and facing Sunset Avenue. (Exhibit 2.) As Officer Herring pulled up to Bryant's vehicle, he saw a woman, later identified as Bryant's girlfriend, Adriana Napier, enter the backseat of the car. (Doc. 35 at PageID 215; Gov. Ex. 2 at 0:02.) Officer Herring found this suspicious because it is common for drug transactions to occur in vehicles and the buyer commonly sits in the backseat of the car. (Doc. 35 at PageID 215.)

Officers Herring and Hoffbauer drove past Bryant's vehicle and turned around. (Ex. 2, 3.) When they returned, they observed that Bryant's vehicle had parked after picking up Napier. (*Id*.) Officer Herring considered it suspicious that Bryant's car, which had just picked up a passenger, had immediately parked again. Based on his training and experience, he suspected the driver pulled into the parking spot because he was trying to blend in and avoid the police. (*Id*. at PageID 216–17.) The dash camera shows the cruiser's overhead lights activated after Bryant's car was parked and the rest of the encounter is recorded on Officer Herring and Hoffbauer's body-worn cameras. (Gov. Exs. 3, 6.)

As soon as Officers Herring and Hoffbauer pulled up, Bryant opened his driver-side door. (Doc. 35 at PageID 221.) In Officer Herring's experience, it is uncommon for a driver to attempt to get out of his or her vehicle as soon as a police vehicle pulls up with lights flashing. (*Id*. at PageID 222.) This led Officer Herring to believe Bryant wanted to run or an attack was pending, so he immediately got out of the police vehicle and approached Bryant's vehicle. (*Id*.)

**B. Traffic Stop of Bryant's Vehicle**

As Officer Herring approached Bryant's vehicle, Bryant was seated in his parked car with the door open and his entire body inside the car with the driver's door open. (Gov. Ex. 3 at 0:35–0:39.) Napier was seated in the backseat. The following exchange occurred:

> Officer Herring: What's up boss man, how you doing? Officer Herring. We got calls about suspicious activity over here. Do you have a valid driver license or state ID?
>
> Bryant: Yeah, all I did was pick my friend up. (Bryant slightly turns and gestures to backseat.)
>
> Officer Herring: Ok, Do you live here?
>
> Bryant: No, she lives here.
>
> Officer Herring: Just pickin' her up. Ok, yeah, it's no biggie. If everything checks out – are you the owner of the car?
>
> Bryant: Yeah, this is my car. Got registration and everything.
>
> Officer Herring: Perfect.
>
> Bryant: I just pulled up! And picked up—yeah—I'm like—
>
> Officer Herring: Yeah—I saw—I saw her getting into your car—yeah, yeah, yeah—
>
> Bryant: Like hold on, what the heck, how can I do anything?
>
> Officer Herring: Like I said, if it's nothing, we just got a call about someone acting weird, so –
>
> Bryant: Oh.
>
> Officer Herring: Yeah, so we'll just get it figured out, it's no big deal, man.

(Gov. Ex. 3 at 0:31-1:08.) During this conversation, Bryant is gathering papers and then hands them over to Officer Herring. (*Id*. at 1:10.) Officer Herring continues to ask Bryant: "Are you like an Uberer or something? Or is she actually a friend or your—?" Bryant responded, "No! She's actually a friend. She asked me for a ride!" and "No, she called me for a ride to take her to

5

the bank. This is my friend!" (*Id*. at 1:10–1:24.) Officer Herring questioned, "What bank? What bank is she going to?" and Bryant responded, "she just called and asked me for a ride, man. That's all I did was offer to give her a ride." (*Id*. at 1:24–1:35.)

Officer Hoffbauer stood at the rear passenger side door and spoke with Napier, who was cooperative. (*Id*. at 0:43–5:00.) Napier confirmed she knows Bryant, lives at the apartment complex and "just wanted a ride to the bank." (Gov. Ex. 6 at 0:43, 3:45–4:00, 4:25–5:00.) Officer Hoffbauer testified that there were no safety concerns with Napier and that she was cooperative and free to leave. (Doc. 35 at PageID 283–84.)

Officer Herring returned to the police cruiser with Bryant's license and registration and reviewed the information on the MDC, which indicated Bryant had an open warrant for failure to pay a traffic ticket (because the query on Bryant's plates had already been run). (*Id*. at PageID 227–28.) Officer Herring stated, "I didn't realize he had a warrant" and "he opened the door *almost immediately* when I pulled in here—so—." (2:29–2:39.) Officer Herring returned to Bryant's vehicle and the following exchange occurred:

Officer Herring: Mr. Bryant, do you know you have a warrant?

Bryant: Warrant for what?!

Officer Herring: Uh, it doesn't really tell me right now.

Bryant: Oh no, I don't, I know I don't have a warrant.

Officer Herring: Ok, just do me a favor, just step out real quick.

Bryant: No, hold on let me call my dad real quick!

Officer Herring: Well don't call anyone, I just want you to step out—

Bryant: No, because I know I don't have any warrants. What's my warrant for?!

6

(*Id*. at 2:45–2:56.) Bryant looked back to the interior of the car a couple of times. (*Id*.) Officer Herring's body-worn camera shows Bryant was holding papers in his right hand and cell phone in his left and motioned to call his father when he was told he had a warrant.

As officers then began to remove Bryant from the vehicle, he held his phone and turned away, as if to try to call someone. (*Id*.) While he was being placed in handcuffs, Bryant insisted he did not have a warrant. Officer Hoffbauer testified that she removed her taser from its holster and pointed it at Bryant during this exchange in case he attempted to flee or force was needed to restrain him. (Ex. 6; Doc. 35 at PageID 280–81.)

Bryant continued to protest that he did not have a warrant and questioned what the warrant was for. (*Id*. at 2:50–3:10.) Officer Herring responded, "I'll tell you in a second. But with you doing all this reaching over and—" (*Id*.) Once in handcuffs, Officer Herring asked, "did you not pay a ticket or something?" (*Id*. at 3:27.) Bryant responded, "Oh! What, oh! No, I paid that ticket. It was um, it was a seatbelt ticket!" (*Id*. at 3:28–3:40.) After he was arrested, officers did a search of Bryant's person and found gaming tickets in his pocket. (*Id*. at 3:50–4:38.) While he was being searched, Bryant questioned why he first was told there was a call about suspicious activity, but then he was told he had a warrant— "it don't make no sense." (*Id*. at 4:17.) Bryant was then placed in a police cruiser. (*Id*. at 4:47.)

### C. Officer Herring Directs Officers to Conduct a Protective Sweep of Bryant's Vehicle Based on "Furtive Movements" and "Anxiety"

After Bryant was placed in the police cruiser, Officer Herring returned to Bryant's vehicle and stated: "Um, due to his furtive movements, and his anxiety, to really immediately remove himself from the car, I think we need to conduct a sweep of the driver area to make sure there's nothing – stuff anywhere." (Gov. Ex. 3 at 4:58–5:12.) An officer standing by the vehicle

7

said, "there you go, there you go, whatever you say, good deal" while looking surprised. (*Id*. at 5:12.)

### D. Whether Marijuana Odor Was Detected Prior to Search

None of the officers mentioned the smell or presence of marijuana prior to the search commencing on Bryant's vehicle. During the search of the vehicle, Lieutenant Schofield inquired to Officer Herring while referring to what is later identified as a marijuana cigarette or joint beside Bryant's car door: "I'm assuming he dropped that as well—or?" (Gov. Ex. 3 at 5:18; Doc. 35 at PageID 198–99.) Officer Herring responded: "He definitely could have, yeah. 'Cause, like I said." (*Id*. at 5:21–5:24.) After the search began, Officer Herring asked Officer Hoffbauer: "Katie, you said you got odor?" to which she replied, "kind of." (Gov. Ex. 3 at 5:29–5:30.) Officer Hoffbauer also asked: "Oh yeah, what did he drop? 'Cause I saw him—" and "he dropped that out of the car—remember, Jerome? I just didn't see what it was 'cause I didn't come over here." (Id. at 3:37–5:53.) While Officer Herring was searching a duffle bag in Bryant's car, he said, "Oooh, yeah, I smell the weed now." (Gov. Ex. 3 at 6:23.)

The officers testified about whether they smelled marijuana or observed conduct linking Bryant to the marijuana cigarette next to Bryant's car door. Lieutenant Schofield testified that he observed "the end of a smoked like joint or blunt that was on the ground outside the driver's door" when he approached Bryant's vehicle. (Doc. 35 at PageID 188.) However, neither he nor any other officer collected and preserved the joint. (*Id*. at PageID 199.) He did not recall whether he smelled marijuana at the scene. (*Id.*)

Officer Herring testified he smelled the odor of marijuana upon his first interaction with Bryant, prior to the search of the vehicle. (*Id.* at PageID 232, 253–54.) He also testified that he found a marijuana cigarette on the ground next to the driver's side door, which was brought to

8

his attention by Officer Hoffbauer. (*Id.* at PageID 232, 254.) Officer Herring testified that he ordered the search based on Bryant's furtive movements and anxiety, but he detected the odor of marijuana as well. (*Id*. at 252.) He "didn't say anything because of our policy in place with the Cincinnati Police Department, we can't search solely based off of the odor. So while I may have the odor of marijuana detected, I need a behavior and a smokeable form, could be a marijuana cigarette…" (*Id*.)

Officer Hoffbauer testified she smelled the odor of marijuana as she was standing at the back door of Bryant's vehicle. (*Id*. at PageID 281.) Officer Hoffbauer also testified that she saw Bryant throw a marijuana cigarette out of his car. (*Id.* at PageID 293.) She testified that she verbalized seeing this before the audio on the dash camera came on as she and Officer Herring were sitting in the police cruiser pulling up to the scene. (*Id*. at PageID 294.) She did not collect the marijuana cigarette as evidence. (*Id.* at 293.)

### E. Procedural History

On April 1, 2021, Bryant was indicted on one count of possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and (2). (Doc. 3.) On May 21, 2021, Defendant filed a Motion to Suppress Evidence. (Doc. 20.) The Government responded in opposition on May 28, 2021. (Doc. 21.) On March 10, 2022, the Court held a hearing on Bryant's Motion to Suppress.[2] (Doc. 34.) The parties filed Post-Hearing Briefs thereafter. (Docs. 37, 38.) The matter is now ripe for ruling.

---

[2] Due to discovery issues, issues with witnesses, and illness, the hearing was rescheduled multiple times. (Docs. 28–32, September 28, 2021 Docket Entry, November 1, 2021 Docket Entry, January 19, 2022 Docket Entry, and February 7, 2022 Docket Entry.)

**II.    LAW**

"The Fourth Amendment safeguards '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) (citing U.S. Const. amend. IV).  Stopping an automobile and detaining its occupants is a seizure under the Fourth Amendment.  *Id*. (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)).  Whether a stop passes constitutional muster is analyzed under the temporary detention standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.  *Id.* at 296 (citing *United States v. Everett,* 601 F.3d 484, 488 (6th Cir. 2010)).  Under this framework, the stop must be both (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  *Id*. (citing *Terry,* 392 U.S. at 20).  "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n.6 (6th Cir. 2004)).  "We primarily enforce these standards through the exclusionary rule, which requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop."  *Id*. (citing *United States v. Blair,* 524 F.3d 740, 748 (6th Cir. 2008)).

Reasonableness of a traffic stop is measured by the same standards set forth for investigatory stops in *Terry*.  *Id*. (citing *Terry*, 392 U.S. 1).  Reasonable suspicion requires "more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.  If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop."  *Id.* (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)).  Reasonable suspicion must be considered

10

"under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'" *Id.* (quoting *Humphrey v. Mabry,* 482 F.3d 840, 846 (6th Cir. 2007)).  Officers are entitled to draw on their own experience and specialized training to make inferences from and deductions about the information available.  *Id*. (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Id*. (quoting *United States v. Campbell,* 549 F.3d 364, 370–71 (6th Cir. 2008) (internal citations omitted)).  "In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'"  *Id*. (citing *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)).  A vehicle stop is limited in scope and degree of intrusion by its purpose and may last no longer than necessary to effectuate the purpose of the stop.  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

"Reasonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants." *Lyons*, 687 F.3d at 764.  "Probable cause to search a vehicle is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *Id*. (citing *Smith v. Thornburg,* 136 F.3d 1070, 1074 (6th Cir. 1998)).  Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Smith*, 136 F.3d at 1074.)

11

III.     ANALYSIS

    **A. Officers Had Reasonable Suspicion to Stop Bryant's Vehicle to Investigate an Open Warrant**

There is no dispute Officer Herring had reasonable suspicion to stop Bryant's car because he knew there was an outstanding warrant for Bryant's arrest and had reasonable suspicion to believe he was in the car. "Once an officer discovers that a car's owner has an outstanding arrest warrant, he needs only reasonable suspicion that the owner is in the vehicle." *United States v. Pyles*, 904 F.3d 422, 424 (6th Cir. 2018) (citing *Delaware*, 440 U.S. at 663). "It is fair to infer that the registered owner of a car is in the car absent information that defeats the inference." *Id*. As in *Pyles*, the evidence establishes Officer Herring knew before making the stop that there was an arrest warrant for Bryant and that the vehicle was registered to him.[3] Officers Herring and Hoffbauer observed a female enter the backseat of Bryant's vehicle, but did not have any information that would convey that Bryant was not the driver of the vehicle. Thus, Officer Herring had no information that would defeat the inference that Bryant was in the car when he initiated the stop.

The Government alternatively argues that it had reasonable suspicion criminal activity was afoot even without the warrant, but the evidence falls short. The Government relies upon the following weak indicators: (1) Bryant's car idled briefly in an apartment lot; (2) the driver seemed to react to being following; (3) Bryant's vehicle picked up a passenger in the back seat; (4) Bryant's car was facing the exit of the parking lot and pulled into a parking spot after a marked police vehicle passed; and (5) the vehicle was observed in a high-crime area. Lieutenant Schofield observed Bryant's vehicle for approximately five to six minutes in a parking lot and

---

[3] Officer Herring made a comment that he did not know Bryant had a warrant after returning to his cruiser with Bryant's license and registration, but the other evidence suggests this was an errant comment and he was fully aware of the warrant at the time he effectuated the stop.

12

found it suspicious that the driver of the vehicle seemed to react to the presence of another vehicle following him in an alleged high-crime area during daylight hours.  Lieutenant Schofield testified that these seemingly innocuous activities may suggest that Bryant was responding to police presence or engaged in drug activity, as drug transactions commonly occur in idling cars in parking lots.  Further, Lieutenant Schofield testified that a passenger entering the backseat is also an indicator of possible drug transactions.

The Sixth Circuit has held that an area being well-known for criminal activity does not itself justify a *Terry* stop—although it can be considered alongside other factors.  *Blair*, 524 F.3d at 750 (citing *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002)).  But there is not much else to consider here.  Lieutenant Schofield confirmed at the Suppression Hearing that he did not observe any criminal activity: no drug transactions, drug use, weapons, or even a traffic violation.  (Doc. 35 at PageID 196–97.)  A late hour can contribute to reasonable suspicion, but such was not the case here as the stop occurred around 5:00 p.m.  *See Blair,* 524 F.3d at 751 (finding 10:30 p.m. not a late enough hour to arouse suspicion of criminal activity).  Further, knowledge of Bryant's criminal history is not enough to create reasonable suspicion, either.  *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (officer's knowledge that vehicle occupant had a criminal history is not enough to create reasonable suspicion, even when combined with other weak indicators such as nervousness and illogical travel plans).

Rather, Lieutenant Schofield observed innocuous behavior, which does not support reasonable suspicion that criminal activity is afoot.  *See United States v. Keith*, 559 F.3d 499, 504 (6th Cir. 2009).  In *Keith*, the court interpreted similarly weak indicators as not rising to the level of reasonable suspicion where police found it suspicious that suspects glanced in the direction of officers and moved away to the far side of a liquor store at 2:00 a.m. located in a

high crime area. *Id*. at 506. The two suspects did not exchange anything or attempt to hide any objects, and police had little else to go on other than the late hour and alleged "bad" neighborhood. *Id*. In fact, it was possible that the men were "indecisive" about which exit to use or that they wished to discard trash in a dumpster. *Id*. Similarly, here, any number of innocent explanations could justify idling Bryant's brief idling and driving decisions.

Here, the alleged "suspicious" behavior observed in five to six minutes during daylight hours in a high crime area included: driving a vehicle, turning around, the driver seeming to respond to a vehicle following it, picking up a passenger in the backseat, and parking after picking up the passenger. Based on Sixth Circuit case law, these factors do not provide reasonable suspicion that criminal activity of drug trafficking is afoot.

### B. Officers Lacked Probable Cause to Search the Vehicle

The Government asserts that the reasonable suspicion it already established ripened into probable cause to search his vehicle. Although the Court found reasonable suspicion on the basis of Bryant's open warrant, it found reasonable suspicion lacking based on the other alleged suspicious behaviors. The Government has not established that reasonable suspicion ripened into probable cause so as to justify a search of Bryant's vehicle.

The Government asserts the following contributed to officers' reasonable suspicion ripening into probable cause: (1) Bryant opened his driver's side door when police activated the cruiser's lights; (2) Bryant gave suspicious responses to police questions about his intentions, including that he was taking his friend to the bank at an hour when banks were closed; (3) Bryant responded nervously to police questioning; (4) Bryant said "no" to the lawful order to get out of his car and stated in a high-pitched, nervous manner that he had no warrants; (5) Bryant reached back to the passenger side of the vehicle; and (6) officers found gaming tickets in his pockets.

14

The Government also asserts that officers had probable cause to search Bryant's car because Officer Herring smelled marijuana before the search began, which can be considered as a sole justification or in combination with the other factors. The Government asserts that these factors, taken together and viewed in the light of the officers' training and experience, provide probable cause that evidence of drug dealing would be found in Bryant's vehicle.

Officer Herring testified that Bryant opening his car door when he pulled up raised concern that he may be intending to run or attack. (Doc. 35 at PageID 222.) He also testified that a pack of five to ten lottery tickets found in Bryant's pocket could have been indicative of drug trafficking because based on his experience, drug dealers use gaming tickets to measure and wrap up quantities of drugs. (*Id*. at PageID 231.) Lieutenant Schofield testified that Bryant looked back at the interior of the car during the encounter with police which could be indicative of a "target glance," or a subconscious look toward a location where something may be held. (*Id*. at PageID 185–86.)

The factors cited by the Government do not establish reasonable suspicion of drug crimes, let alone probable cause. As an initial matter, the Court does not give much weight to Bryant's nervous behavior or alleged implausible explanation for being at the apartment complex. Bryant was legitimately confused about the reason for being stopped as *he* was given implausible answers by Officer Herring. The explanation that Bryant was picking up Napier to take her to the bank *was* a plausible response, and one that was corroborated by Napier herself. Regardless, nervous behavior is generally not a reliable indicator of criminal activity. *See United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) (nervousness is inherently unsuspicious and is therefore generally given very limited or no weight in the reasonable-suspicion calculation).

15

However, the Court gives some weight to the fact that Bryant refused the lawful order to step out of the vehicle as being a potential indicator of aggression. It also gives some weight to the alleged target glance back to the car's interior. Overall, however, although Bryant was worked up and excitable, he was not aggressive, and the Court did not observe wild, furtive movements by Bryant. The Court viewed Bryant as gesturing towards his phone when he mentioned calling his father as opposed to giving a target glance or reaching back to another part of the vehicle. The rest of the behaviors described, such as possessing lottery tickets and opening his car door, simply do not rise to the level of reasonable suspicion, let alone probable cause that Bryant's vehicle would contain evidence of drug trafficking. And without more, the initial refusing to get out of his car and alleged target glance do not establish probable cause to search the vehicle.

Although the Sixth Circuit has held that an officer smelling marijuana emanating from a vehicle provides probable cause to search that vehicle for evidence of drug trafficking, the evidence was conflicting and did not conclusively establish that officers smelled marijuana or observed Bryant throw marijuana from his vehicle prior to the search commencing. *See United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993); *accord United States v. Foster*, 376 F.3d 577, 583–84 (6th Cir. 2004); *see also United States v. Jackson*, 63 F. App'x 839, 842 (6th Cir. 2003) ("We conclude that during a reasonable stop of the car, the two police officers smelled marijuana coming from the car's interior, and that this discovery provided probable cause to search the automobile.")

Here, no officer mentioned the smell of marijuana or observation of Bryant throwing a marijuana joint or cigarette from Bryant's vehicle prior to commencing the search of the vehicle. Officer Herring did not cite marijuana odor in his explanation ordering a search of Bryant's

16

vehicle. When Lieutenant Schofield pointed out the marijuana cigarette to Officer Herring—after the vehicle search had commenced—he asked, "I'm assuming he dropped that as well – or?" and Officer Herring responded, "He definitely could have, yeah. 'Cause like I said." (Gov. Ex. 3 at 5:18–5:24; Doc. 35 at PageID 198–99.) Officer Herring's tentative response did not suggest to the Court that Officer Herring definitely smelled marijuana prior to the search or that Officer Hoffbauer pointed out Bryant throwing the cigarette from his vehicle. In fact, the response suggested that it could possibly be, but he was not sure. The fact that no officer preserved the evidence also supports this conclusion. Finally, the Court was surprised by Officer Herring's emphatically stating, "Oooh, yeah, I smell the weed now" in the middle of the search of Bryant's vehicle. (Gov. Ex. 3 at 6:23.) The Court, watching the exchange during the Suppression Hearing for the first time, interpreted this as Officer Herring confirming his suspicion that he *might* smell marijuana during the search, but not that he *already* did.

After the search began, Officer Herring asked Officer Hoffbauer: "Katie, you said you got odor?" to which she replied, "kind of." (Gov. Ex. 3 at 5:29–5:31.) Later, Officer Hoffbauer stated that she saw Bryant throw something out of the vehicle. (Gov. Ex. 6 at 5:37–5:53.) Again, the way Officer Hoffbauer and Officer Herring interacted on this topic did not convey that they both smelled the odor of marijuana and knew Bryant threw marijuana from his vehicle prior to the search commencing. Thus, when the officers provided their court testimony explaining that they *did* in fact smell marijuana prior to the search, the Court did not find the explanations credible when viewed against the objective video evidence suggesting otherwise.

The Court finds that the reasonable suspicion officers had to investigate an open warrant when it stopped Bryant's vehicle did not develop into reasonable probable cause to search his car for evidence of drug crimes. Based on the totality of the circumstances, there was insufficient

17

evidence to suggest that evidence of a crime would be found in Bryant's vehicle.  Accordingly, the search of Bryant's vehicle violated the Fourth Amendment, and all evidence seized as a result of the search must be suppressed as fruits of the poisonous tree.  *See Blair*, 524 F.3d at 753 (suppressing fruits of illegal search).  The benefits of excluding the evidence seized as a result of the improper search of Bryant's vehicle exceed the costs of potentially letting a guilty and possibly dangerous defendant go free.  To condone the type of conduct involved would give police officers carte blanche to search a vehicle based on innocuous behavior.  As such, Defendant's Motion to Suppress is well-taken and will be **GRANTED**.

## IV. CONCLUSION

For the reasons set forth therein, the Court **GRANTS** Defendant's Motion to Suppress Evidence (Doc. 20).

**IT IS SO ORDERED.**

S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court